IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED IN OPEN COURT
FEB 16 2010
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:10-CR- | |
| | ) | | |
| v. | ) | Count 1: | 18 U.S.C. § 371 |
| | ) | | (Conspiracy) |
| ANDREW B. SILVA, | ) | | |
| | ) | Count 2: | 18 U.S.C. § 1001 |
| Defendant. | ) | | (False Statement) |
| | ) | | |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### Background

At all times relevant to this Criminal Information, unless otherwise indicated:

1. The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States by its citizens.

2. United States citizens and residents had an obligation to report to the Internal Revenue Service on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether that individual had a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained. United States citizens and residents have an obligation to report all income earned from foreign bank accounts on the tax return.

3. United States citizens and residents who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts on Form TD F 90-22.1 (the "FBAR"). The FBAR for the applicable year was due by June 30 of the following year.

4. An "undeclared account" was a financial account maintained in a foreign country that has not been reported to the United States government on a tax return and an FBAR.

5. Individuals who physically transported, mailed or shipped, or caused to be physically transported, mailed, shipped or received, currency, traveler's checks, and certain other monetary instruments in an aggregate amount exceeding $10,000 into the United States were required to file a FinCen Form 105, Report of International Transportation of Currency or Monetary Instruments ("CMIR"), with the Bureau of Customs and Border Protection.

6. United States law prohibited individuals from structuring mailings of U.S. currency into the United States in amounts less than $10,000 if the purpose of the structuring was to evade the requirement to file a CMIR.

7. The "International Bank" was one of the largest international banks in the world and was headquartered in England. It conducted banking throughout the world, including in the Eastern District of Virginia and in Geneva and Zurich, Switzerland.

8. The International Bank, including its Swiss banks, entered into a qualified intermediary agreement ("QI Agreement") with the IRS in 2001.

## The Conspirators

9. Defendant ANDREW B. SILVA, a naturalized U.S. citizen, resided in Sterling, Virginia. From 1997, he had a financial interest in an undeclared Swiss account at a Swiss bank owned by the International Bank.

10. "The Zurich Attorney," an unindicted co-conspirator, was a partner in the Zurich office of an independent Swiss law firm. He held law degrees from the University of Zurich and New York University. He was a member of the New York Bar since 1989.

11. "The Swiss Banker," an unindicted co-conspirator, was a banker at the International Bank in Zurich.

## The Tax Fraud Scheme

12. The tax fraud scheme involved:

   a. Concealing the existence and ownership of the undeclared Swiss accounts by United States persons through the use of a sham Liechtenstein trust;

   b. Using U.S. currency, and prohibiting the use of wire transfers, to conceal withdrawals from defendant ANDREW B. SILVA's undeclared Swiss account from United States authorities; and

   c. Assisting defendant ANDREW B. SILVA in structuring transactions in U.S. currency in amounts less than $10,000 in order to evade certain reporting requirements, including the filing of a CMIR with the United States government upon crossing the border or physically transporting, mailing, shipping or receiving United States currency in excess of $10,000.

## COUNT ONE

13. The allegations contained in paragraphs 1 through 12 are realleged and incorporated herein.

14. From at least 1997 and continuing up to and including December 2009, in the Eastern District of Virginia and elsewhere, the defendant ANDREW B. SILVA, together with his co-conspirators, did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree together, with each other, and with other individuals both known and unknown to the United States Attorney to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of the Treasury, for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of federal income taxes.

15. It was a part and an object of the conspiracy that defendant ANDREW B. SILVA and his co-conspirators, including the Zurich Attorney and the Swiss Banker, would and did defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment and collection of United States income taxes.

### Means and Methods of the Conspiracy

16. Among the means and methods by which defendant ANDREW B. SILVA, the Zurich Attorney, the Swiss Banker, and their co-conspirators would and did carry out the conspiracy were the following:

17. It was part of the conspiracy that the Zurich Attorney would and did use a sham Liechtenstein trust to conceal defendant ANDREW B. SILVA's financial interest in an undeclared Swiss account at the International Bank.

18. It was further part of the conspiracy that the Zurich Attorney would and did counsel defendant ANDREW B. SILVA to keep the existence of, and his financial interest in, his undeclared Swiss account a secret by not sending communications either to or from the United States that referenced his undeclared Swiss account, by not placing telephone calls to Switzerland, and by not sending electronic mail communications to Switzerland.

19. It was further part of the conspiracy that the Zurich Attorney would and did inform defendant ANDREW B. SILVA that if he wished to transact business or meet to discuss his undeclared Swiss account he should send a coded letter to Switzerland stating that he wished to "meet for coffee."

20. It was further part of the conspiracy that the Zurich Attorney and the Swiss Banker would and did inform defendant ANDREW B. SILVA that he could not wire transfer funds from his undeclared Swiss account to the United States because it would create a paper trail for United States authorities.

21. It was further part of the conspiracy that defendant ANDREW B. SILVA, the Zurich Attorney, and the Swiss Banker would and did agree that any withdrawals from defendant ANDREW B. SILVA's undeclared Swiss account would be in the form of cash.

22. It was further part of the conspiracy that the Zurich Attorney would and did advise defendant ANDREW B. SILVA that he should not be in possession of account statements or other documentation relating to his undeclared Swiss account in order to maintain secrecy.

23. It was further part of the conspiracy that the Zurich Attorney would and did advise defendant ANDREW B. SILVA that if he transported less than $10,000 in U.S. currency into the United States that he would not have to declare the funds to U.S. Customs upon re-entry to the United States.

24. It was further part of the conspiracy that the Zurich Attorney would and did assist defendant ANDREW B. SILVA in structuring the transportation and shipping of approximately $235,000 in U.S. currency into the United States for the purposes of evading the currency and monetary instrument reporting requirements and to conceal the undeclared Swiss bank account from the IRS.

25. It was further part of the conspiracy that defendant ANDREW B. SILVA would and did fail to disclose the existence of the Swiss account to his tax return preparer, the results of which were that the account was not declared on Schedule B of his individual income tax returns Form 1040, no income earned on that account was included on his individual income tax returns Form 1040, and no FBARs were filed with the Department of the Treasury with respect to the Swiss account.

## OVERT ACTS

In furtherance of the conspiracy and to effect the illegal objects thereof, defendant ANDREW B. SILVA and his co-conspirators, including the Zurich Attorney and the Swiss Banker, committed the following overt acts, among others, in the Eastern District of Virginia and elsewhere:

26. In or about May 1999, during a meeting in Zurich, Switzerland, the Zurich Attorney advised defendant ANDREW B. SILVA that his undeclared Swiss account was worth approximately $250,000.

27. In or about May 1999, during a meeting in Zurich, Switzerland, the Zurich Attorney advised defendant ANDREW B. SILVA that his undeclared Swiss account was "hush-hush" and that it would be best if he did not talk to others about it.

28. In or about May 1999, during a meeting in Zurich, Switzerland, the Zurich Attorney denied defendant ANDREW B. SILVA's request for documentation relating to his undeclared Swiss account and told him that in order to maintain secrecy he should not have account statements in his possession.

29. In or about May 1999, during a meeting in Zurich, Switzerland, the Zurich Attorney advised defendant ANDREW B. SILVA that if he took less than $10,000 in U.S. currency with him back to the United States that he would not have to declare the funds by making certain reports and disclosures to the United States government upon re-entry to the United States.

30. In or about May 1999, after meeting with the Zurich Attorney, defendant ANDREW B. SILVA withdrew approximately $9,000 in U.S. currency from his undeclared Swiss account with the assistance of the Zurich Attorney's secretary.

31. In or about May 1999, defendant ANDREW B. SILVA transported approximately $9,000 in U.S. currency from Switzerland to the United States.

32. In or about August 2009, ANDREW B. SILVA was informed that the International Bank was closing his undeclared Swiss account and that he had until the end of the year to travel to Switzerland to withdraw all funds.

33. In or about September 2009, defendant ANDREW B. SILVA sent a letter from the Eastern District of Virginia to the Zurich Attorney in Zurich, Switzerland requesting that the two "meet for coffee."

34. On or about October 12, 2009, defendant ANDREW B. SILVA met with the Zurich Attorney in Zurich, Switzerland to discuss closing defendant ANDREW B. SILVA's undeclared Swiss account that was then worth approximately $268,000.

35. On or about October 12, 2009, during a meeting in Zurich, Switzerland, the Zurich Attorney informed defendant ANDREW B. SILVA that the Zurich Attorney would not be involved with a wire transfer of funds, and the International Bank would not wire transfer the contents of his undeclared Swiss account to the United States because a wire transfer would create a trail for U.S. authorities regarding the undeclared Swiss account.

36. On or about October 12, 2009, during a meeting in Zurich, Switzerland, defendant ANDREW B. SILVA informed the Zurich Attorney that he intended to liquidate his undeclared Swiss account by mailing the currency to his home in Sterling, Virginia in envelopes containing less than $10,000.

37. On or about October 12, 2009, during a meeting in Zurich, Switzerland, the Zurich Attorney counseled defendant ANDREW B. SILVA to mail the envelopes containing U.S. currency from numerous Swiss Post offices in order to avoid detection by U.S. authorities.

38. On or about October 12, 2009, during a meeting in Zurich, Switzerland, the Zurich Attorney caused defendant ANDREW B. SILVA to be provided with internet print-outs of the locations of four separate Swiss Post offices in Zurich within an approximately four mile radius of each other.

39. On or about October 12, 2009, during a meeting in Zurich, Switzerland, the Zurich Attorney counseled ANDREW B. SILVA to stagger the sending of the envelopes containing U.S. currency via both regular and priority mail so that the envelopes would not arrive in the United States at the same time.

40. On or about October 12, 2009, in Zurich, Switzerland, the Zurich Attorney caused his secretary to inspect the envelopes defendant ANDREW B. SILVA intended to use to mail U.S. currency to the United States to ensure that the envelopes did not look suspicious.

41. On or about October 12, 2009, defendant ANDREW B. SILVA met with the Swiss Banker at the private wealth office of International Bank in Zurich, Switzerland to discuss his undeclared Swiss account.

42. On or about October 12, 2009, during a meeting in Zurich, Switzerland, the Swiss Banker informed defendant ANDREW B. SILVA that International Bank was closing down all accounts held by United States citizens and residents.

43. On or about October 12, 2009, during a meeting in Zurich, Switzerland, the Swiss Banker counseled defendant ANDREW B. SILVA that International Bank would not wire transfer money to the United States because doing so would create a trail for U.S. authorities regarding the undeclared Swiss account.

44. On or about October 12, 2009, during a meeting in Zurich, Switzerland, the Swiss Banker provided defendant ANDREW B. SILVA with an individually wrapped "brick" of $100,000 of sequentially numbered, new $100 bills and a second bundle of sequentially numbered, new $100 bills totaling $15,000.

45. On or about October 13, 2009, defendant ANDREW B. SILVA mailed an envelope containing approximately 87 separate, sequentially marked $100 bills taped inside a travel brochure from Zurich, Switzerland to his residence in Sterling, Virginia.

46. On or about October 13, 2009, defendant ANDREW B. SILVA mailed approximately $97,000 in U.S. currency in 12 additional envelopes containing amounts under $10,000 from Swiss Post offices in Zurich, Switzerland to his residence in Sterling, Virginia.

47. On or about October 13, 2009, defendant ANDREW B. SILVA transported approximately $9,000 in U.S. currency from Switzerland to the United States.

48. In or about November 2009, defendant ANDREW B. SILVA sent a letter from the Eastern District of Virginia to the Zurich Attorney in Zurich, Switzerland requesting that the two "meet for coffee."

49. On or about November 20, 2009, during a meeting in Zurich, Switzerland, the Zurich Attorney provided defendant ANDREW B. SILVA with a manila folder that contained a "brick" of $100,000 of sequentially numbered, new $100 bills and a second bundle of sequentially numbered, new $100 bills totaling $20,000 from his undeclared Swiss account.

50. On or about November 20, 2009, during a meeting in Zurich, Switzerland, the Zurich Attorney showed defendant ANDREW B. SILVA statements of the undeclared Swiss account at International Bank, but did not provide him with copies, and counseled him not to carry copies because doing so could lead to the discovery of the account by U.S. authorities.

51. On or about November 21, 2009, defendant ANDREW B. SILVA mailed a total of $101,500 in U.S. currency in 12 envelopes containing U.S. currency in amounts ranging from $4,000 to $12,600 from Swiss Post offices in Zurich, Lucerne, and Geneva, Switzerland to his residence in Sterling, Virginia.

52. On or about November 21, 2009, defendant ANDREW B. SILVA mailed an envelope containing U.S. currency in an amount under $10,000 from a Swiss Post office to a residence in the Western District of Wisconsin.

53. On or about November 23, 2009, defendant ANDREW B. SILVA transported approximately $9,000 in U.S. currency from Switzerland to the United States.

54. On or about November 23, 2009, at Dulles International Airport, upon his return to the United States, defendant ANDREW B. SILVA, falsely stated to a U.S. Customs Inspector that he had not recently mailed any U.S. currency from Switzerland into the United States.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

On or about November 23, 2009, at Washington Dulles Airport in the Eastern District of Virginia, the defendant ANDREW B. SILVA did knowingly and willfully make a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, SILVA falsely stated to officers of Customs and Border Protection and Immigration and Customs Enforcement of the Department of Homeland Security that he had not recently mailed any U.S. currency from Switzerland into the United States.

In violation of Title 18, United States Code, Section 1001(a)(2).

Neil H. MacBride
United States Attorney

Kevin Downing
Senior Litigation Counsel

John Sullivan
Trial Attorney

Mark F. Daly
Trial Attorney
United States Department of Justice,
Tax Division

By: _____
Gordon D. Kromberg
Assistant United States Attorney